**DAPEER ROSENBLIT LITVAK LLP**
William Litvak
(California State Bar No. 90533)
wlitvak@drllaw.com
11500 W. Olympic Blvd. Suite 550
Los Angeles, California 90064
Telephone: (310) 477-5575

**EDELSBERG LAW, PA**
Scott Edelsberg*
(Florida Bar No. 0100537)
(California Bar No. *Pending*)
scott@edelsberglaw.com
20900 NE 30th Ave #417
Aventura, Florida 33180
Telephone: (305) 975-3320

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis*
(Florida Bar No. 101754)
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299
*Pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH HILL, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BBVA USA, an Alabama Corporation <br><br> Defendants. | Case No : **'20CV1016 BEN WVG** <br><br> **CLASS ACTION COMPLAINT** <br><br> **[DEMAND FOR JURY TRIAL]** |

1

CLASS ACTION

**CLASS ACTION COMPLAINT**

Plaintiff Sarah Hill on behalf of herself and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

**INTRODUCTION**

1.      Plaintiff brings this action on behalf of themselves, the general public, and classes of all similarly situated consumers against Defendant BBVA USA ("BBVA" or "Bank"), arising from their routine practices of (a) assessing OD Fees on transactions that did not actually overdraw the account; and (b) charging more than one non-sufficient funds fee ("NSF Fee") on a single item.

2.      BBVA misleadingly and deceptively misrepresents the above practices in its publicly available marketing materials, including its own account contracts. BBVA also omits material facts pertaining to each of the above practices in its publicly available marketing materials, including its account contracts.

3.      BBVA's customers have been injured by BBVA's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with BBVA.

4.      In addition, the deception, aimed at general public, continues to this day. BBVA's account contracts (including the Consumer Account Deposit Agreement and the Fee Schedule) and marketing materials (including the

Overdraft Disclosure) and are publicly available online and in BBVA branches to all current and prospective accountholders. The general public relies on representations in these documents in making important financial decisions regarding with whom they would like to open a checking account. Consumers who have already opened accounts also rely on the misrepresentations and omissions in the publicly available account documents when making every day financial transactions.

5.    The Pew Charitable Trusts has emphasized the importance of transparent checking account fee disclosures for both comparison shopping for checking accounts and for effective fee avoidance:

> Bank accounts are an essential financial product, used by 9 in 10 American households, and need to be safe and transparent. Account agreements and fee schedules provide customers with account costs, terms, and conditions. Among the largest U.S. banks, however, the median length of checking account disclosure documents is 40 pages, and the information is presented in varied formats with inconsistent wording, making it difficult for consumers to easily find the information they need to comparison shop, avoid overdraft and other fees, and manage their money.

The Pew Trusts, "The Benefits of Uniform Checking Account Disclosures."

6.    Members of the public considering opening a checking account have the right to accurate information regarding the checking accounts they are considering.  Research shows that fees are the most important factor influencing consumers' selection of a new banking provider. *See* Ron Shevlin, "How

CLASS ACTION

Consumers Choose a Bank: A Tale of Two Surveys." Insight Vault, Cornerstone Advisors, 23 Aug. 2018, www.crnrstone.com/insightvault/2018/08/23/how-consumers-choose-a-bank-a-tale-of-two-surveys/ (summarizing two consumer surveys that revealed that the most important factor influencing consumers' selection of a new banking provider is the amount of fees charged); Claire Greene and Joanna Stavins, The 2016 and 2017 Surveys of Consumer Payment Choice: Summary Results. Federal Reserve Bank of Boston, 10 May 2018, www.bostonfed.org/publications/research-data-report/2018/the-2016-and-2017-surveys-of-consumer-payment-choice-summary-results.aspx (finding that 4 in 10 consumers who did not have a bank account cited expense as the reason, including "fees and service charges are too high.").

7.     Reasonable consumers would not agree to open BBVA checking accounts if they were informed, for example, that they could incur overdraft fees on transactions that did not overdraw their account; could incur two or three insufficient funds fees on a single attempted electronic payment; or could incur three or four discrete ATM fees for a single out-of-network ATM use.

8.     On behalf of themselves, the general public, and the Classes, Plaintiff seek damages, restitution, and public injunctive relief for Defendant' breach of contract and violations of California's consumer protection laws.

//

**PARTIES**

9.     Sarah Hill is a resident of San Diego, California and holds a BBVA checking account.

10.     Defendant BBVA USA is engaged in the business of providing retail banking services to consumers, including Hill and members of the putative Classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts. BBVA USA operates banking centers, and thus conducts business, throughout the State of California and the United States.

**JURISDICTION AND VENUE**

11.     BBVA USA regularly and systematically provides retail banking services throughout the State of California, including in this county, and provides retail banking services to its customers, including members of the putative Class. As such, it is subject to the personal jurisdiction of this Court.

12.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BBVA.

//

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BBVA is subject to personal jurisdiction here and regularly conducts business in this District, and because Plaintiff was assessed fees in this district

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.     BBVA CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

#### A. Overview of Claim

14.     Plaintiff bring this cause of action challenging BBVA's practice of charging overdraft fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

15.     Here is how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, BBVA immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because BBVA has already sequestered these funds for payment.

16.     However, BBVA still assesses crippling $32 OD Fee on many of these transactions and mispresents its practices in its account documents.

//

---

CLASS ACTION

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, BBVA later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN transactions.

18.     BBVA maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, BBVA sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

19.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

20.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

21.     Still, despite keeping those held funds off-limits for other transactions, BBVA improperly charges OD Fees on those APPSN Transactions, although the APPSN transactions **always** have sufficient available funds to be "covered."

22.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no

reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

23.     There is no justification for these practices, other than to maximize BBVA's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But BBVA is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the

latter to the tune of millions of dollars each year. But BBVA was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

24.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in BBVA's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of BBVA's processes and practices. These practices also exploit contractual discretion to gouge consumers.

25.     In plain, clear, and simple language, the checking account contract documents covering overdraft fees promise that BBVA will only charge overdraft fees on transactions that have insufficient funds to "cover" that transaction.

26.     In short, BBVA is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

27.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from BBVA. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to BBVA, which verifies that the customer's account is valid and that sufficient available funds exist to "cover"

the transaction amount.

28.    At this step, if the transaction is approved, BBVA immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

29.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

30.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account. This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

31.    There is no change—no impact whatsoever—to the available funds in

CLASS ACTION

an account when posting or payment of a transaction that settles in the same amount for which it authorized occurs. That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

**C. BBVA's Account Contract**

32.     Plaintiff has a BBVA checking account, which is governed by BBVA's standardized Consumer Account Agreement.

33.     The standardized Consumer Account Agreement is a publicly available document available online and in BBVA branches to all current and prospective accountholders. Consumers, and the general public, rely on account agreements like BBVA's in making important financial decisions regarding to whom they would like to entrust their money. In addition, BBVA accountholders rely on the Consumer Deposit Account Agreement in making every day financial transactions and predicting which transactions will incur fees and for how much.

34.     The Consumer Deposit Account Agreement and relevant contract documents covering overdraft fees provide that BBVA will only charge OD Fees on transactions with insufficient funds to cover a given transaction:

Available Balance. The balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance reflects any holds placed on your account, including the restrictions described in the Funds Availability Disclosure included with this Agreement. Your available balance may be more or less than the amount of your posted balance, but does not include any credit available under any

BBVA USA Overdraft Protection Line of Credit you may have.

[…]

If an item was initiated at a point-of-sale terminal or is a VISA transaction or ATM transaction, you agree that we may charge the amount of the item to your account or place a hold on your account in the amount requested by the merchant immediately upon authorization of such transaction, even though we have not then actually received the item for payment. We will make payment for a transaction only after the actual transaction is presented to us physically or electronically. Each such hold will reduce the available balance in your account by the amount of the hold.

[…]

Insufficient Available Balance and Overdrafts. If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, return any of the items unpaid or pay any or all of the items, even though payment will cause an overdraft of your account. We may return any item at any time if your available balance is insufficient to pay that item, even if we previously have permitted overdrafts. You are not entitled to rely on any prior act by us with respect to your account. Our election to pay overdrafts does not establish a course of dealing between you and us or modify the terms of this Agreement. You agree that, if your available balance is insufficient to pay any item presented against your account, you will pay promptly both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand.

Exhibit A, Consumer Account Agreement.

35.     The "What You Need to Know about Overdrafts and Overdraft Fees" disclosure ("Overdraft Disclosure") also contains important representations. Consumers, and the general public, rely on the Overdraft Disclosure in making important financial decisions regarding to whom they would like to entrust their

money. In addition, BBVA accountholders rely on the Overdraft Disclosure in making every day financial transactions and predicting which transactions will incur fees and for how much. The Overdraft Disclosure states:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but the transaction is paid anyway.
>
> [….]
>
> We may, at our discretion, authorize and pay overdrafts for the following types of transactions: (i) checks and other transactions made using your checking account number; and (ii) automatic bill payments. If you do not want BBVA to authorize and pay overdrafts arising from checks and other transactions made using your checking account number and from automatic bill payments, you must opt-out of our standard overdraft practices for these types of transactions.

36.    The critical contract term "to cover" is never defined.

37.    For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet BBVA assesses OD Fees on them anyway.

38.    Moreover, the Overdraft Disclosure reaffirms that debit card transactions are "authorized and paid" immediately in one fell swoop. BBVA clarifies that authorization and payment are linked and essentially a coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction.

39.   In fact, BBVA actually "authorizes" transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "pay" those same transactions when they settle. Instead, it uses a secret posting process described below.

40.   All these representations and contractual promises are untrue. In fact, BBVA charges OD Fees even when sufficient funds exist to "cover" transactions that are "authorized and approved" into a positive balance. No express language in any document states that BBVA may impose overdraft fees on any APPSN Transactions.

41.   The account documents misconstrue BBVA's true debit card processing and overdraft practices.

42.   First, and most fundamentally, BBVA charges overdraft fees on debit card transactions for which there are sufficient funds available to "cover" the transactions. That is despite contractual representations that BBVA will only charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction.

43.   BBVA assesses OD Fees on APPSN Transactions that *do* have sufficient funds available to "cover" them throughout their lifecycle.

44.   BBVA's practice of charging OD Fees even when sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so.

CLASS ACTION

This discrepancy between BBVA's actual practice and the contract causes consumers like Plaintiff to incur more overdraft fees than they should.

45.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

46.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what BBVA does when it re-debits the account during a secret batching posting process.

47.     In reality, BBVA's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

48.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, BBVA cannot then charge an overdraft fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

49.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, BBVA does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, BBVA releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits

16
CLASS ACTION

the same transaction a second time.

50.     This secret step allows it to charge overdraft fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which BBVA specifically set aside money to pay them.

51.     This discrepancy between BBVA's actual practices and the contract causes consumers to incur more overdraft fees than they should.

52.     In sum, there is a huge gap between BBVA's practices as described in the account documents and BBVA's practices in reality.

### D.  BBVA Abuses Contractual Discretion

53.     BBVA's treatment of debit card transactions to charge overdraft fees is not simply a breach of the express terms of the numerous account documents. In addition, BBVA exploits contractual discretion to the detriment of accountholders when it uses these policies.

54.     The terms "hold" and "to cover" a transaction is undefined. BBVA uses its discretion to define "hold" and "to cover" in a manner contrary to any reasonable, common sense understanding of that term. In BBVA's implied definition, a transaction is not "covered" even if BBVA sequesters sufficient available funds for that transaction.

//

//

CLASS ACTION

55.     Moreover, BBVA uses its contractual discretion to cause APPSN Transactions to incur overdraft fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

56.     BBVA uses all of these contractual discretion points unfairly to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

**E. Plaintiff Hill's Debit Card Transactions**

57.     By way of example only, on December 6, 2019, Plaintiff was charged an overdraft fee in the amount of $32 for a debit card transaction that settled that day, despite the fact that positive funds were deducted immediately for that transaction on which she was assessed an overdraft fee at the time of authorization.

**II.   BBVA CHARGES MULTIPLE NSF FEES ON THE SAME ITEM**
**A. Overview of Claim**

58.     Plaintiff brings this cause of action challenging BBVA's imposition of more than one NSF Fee on the same item.

59.     As discussed more fully below, it is a breach of the Bank's contract and of reasonable consumers' expectations for the Bank to charge more than one NSF Fee, on the *same item*, since the contract explicitly states—and reasonable consumers understand—that the same item cannot more than one fee.

//

**B. Plaintiff Hill's Experience**

60.     By way example only, on September 13, 2019, Ms. Hill attempted to make a transfer to Paypal in the amount of $4.19.   Because Ms. Hill had insufficient funds in her account, BBVA rejected that payment request and charged Ms. Hill a $32 NSF Fee for doing so.   Unbeknownst to Plaintiff, that very same item was processed again by BBVA days later, on September 24, with BBVA calling the transaction a "RETRY PAYMENT" on the bank statement.   This time, BBVA again returned the item for insufficient funds and charged Plaintiff a $32 OD Fee for doing so.   In sum, *BBVA charged Plaintiff $64 in fees to process a single bill payment of $4.19.*

61.     Ms. Hill took no affirmative action to reinitiate or resubmit the item.

62.     Plaintiff understood the Paypal transfer to be a single item, capable at most of receiving a single NSF *or* OD Fee. BBVA itself also understood the transaction to be a single item, and its systems categorized it as such.   Indeed, on Ms. Hill's bank statements, BBVA described subsequent attempts to debit the transaction as "RETRY PAYMENT."

63.     Instead—and unlike of BBVA's major competitors such as JP Morgan Chase, which does not charge multiple NSF or OD Fees on the same item—BBVA charges more than one NSF Fee on the same item.

//

64.     BBVA has charged Plaintiff this deceptive fee numerous times on a variety of similar transactions.

**C. Relevant Account Documents**

65.     The account documents promise that only one NSF Fee or OD Fee will be charged per item.

66.     The Fee Schedule is a publicly available document available online and in BBVA branches to all current and prospective accountholders.  Consumers, and the general public, rely on the Fee Schedule in making important financial decisions regarding to whom they would like to entrust their money and predicting which transactions will incur fees and for how much. In addition, BBVA accountholders rely on the Fee Schedule in making every day financial transactions.

67.     According to the Fee Schedule:

Insufficient Funds (NSF) Charge - Returned Item $32 Per returned item presented against insufficient funds

[…]

Insufficient Funds Charge (NSF) - Returned Item $32 per item
Fee Schedule, Exhibit B.

68.     The Consumer Deposit Account Agreement also supports these promises, especially when it defines "Item" as:

Item. A check, substitute check, draft, withdrawal order, payment order, or other similar instrument, order or instruction, whether oral,

written or electronic, either for the deposit of funds to your account or for the payment of funds from your account. Items include debits and credits for point-of-sale, ATM, and Debit Card transactions.

"Consumer Account Agreement, Important legal information, disclosures, and terms you need to know," *see* Exhibit A, p. 1 ("Consumer Deposit Account Agreement").

69.     The general public relies on marketing materials like the above in making important financial decisions regarding to whom they would like to entrust their money.

70.     The terms of those agreements are starkly binary:  for a given item, the Bank may assess only a single fee.

71.     This abusive practice is not universal in the banking industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF or OD Fee on the same item when it is submitted for payment multiple times.

72.     Banks like Defendant know how to plainly and clearly disclose this abusive practice.  Indeed, other banks that do engage in this abusive practice disclose it expressly to their accountholders—something Defendant here never did.

73.     For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as Wells, but at least expressly states:

//

Because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

74.     First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION.

75.     Klein Bank similarly states in its Online Banking Agreement:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

76.     BBVA intentionally provides no such disclosure, in an effort to deceive its accountholders.

**D. BBVA Abuses Contractual Discretion**

77.     To the extent the account documents do not explicitly bar the policies described above, BBVA exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies.

78.     The Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations.  BBVA uses its contractual discretion to set the meaning of that term to choose a meaning that directly causes more NSF Fees or OD Fees.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff bring this action on behalf of themselves and on behalf of all others similarly situated. The Classes include:

> All holders of a BBVA checking and/or money market account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, incurred more than one NSF Fee on the same item (the "Multiple Fee Class").

> All holders of a BBVA checking account in California who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on transactions that were authorized into a positive available balance (the "APPSN Class").

> All consumers in California eligible to open a BBVA checking account (the "Injunctive Relief Class").

80.    Excluded from the Classes are Defendant, their subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which defendants have a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

81.    Plaintiff reserve the right to modify or amend the definition of the proposed Classes and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

82.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the class members.  These questions predominate over questions that may affect only individual class members because BBVA has acted on grounds generally applicable to the classes. Such common legal or factual questions include, but are not limited to:

    a)  Whether BBVA improperly charged multiple NSF Fees on the same item;

    b)  Whether BBVA improperly charged OD Fees on APPSN Transactions;

    c)  Whether such conduct enumerated above violates the contract;

    d)  Whether such conduct is deceptive or in bad faith;

//

//

//

CLASS ACTION

e) Whether Plaintiff and other members of the Classes have sustained damages as a result of BBVA wrongful business practices described herein, and the proper measure of damages; and

f) Whether BBVA's fee disclosures are deceptive and misleading to both U.S. Bank customers and the general public.

83.     The parties are numerous such that joinder is impracticable.   Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to BBVA's records.   BBVA has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

84.     It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.   The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

CLASS ACTION

85.     Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices by BBVA, as described herein.

86.     Plaintiff is more than an adequate representative of the Classes in that she has a BBVA checking account and has suffered damages as a result of BBVA's improper business practices.  In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed Class members;

c) They anticipate no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

87.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

88.     BBVA has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

89.    All conditions precedent to bringing this action have been satisfied and/or waived.

## DESCRIPTION OF PUBLIC INJUNCTIONS SOUGHT

90.    Plaintiff is seeking injunctions on behalf of herself, the Injunctive Relief Class (under Rule 23(b)(2)), and the public, prohibiting BBVA from making material omissions and misrepresentations to the public as to the nature and amount of the fees that it assesses on its customers.

91.    Fees are one of the most important factors that consumers take into account when deciding whether to open a checking account, and which financial institution to bank with. The public has the right to a transparent marketplace in which banks are open and honest about the number, nature, and amount of fees they charge, and the circumstances under which those fees are assessed.

92.    The injunctive relief sought by Plaintiff will protect the public from BBVA's deceitful marketing practices which lure customers in by understanding the amount and frequency it assesses OD and NSF Fees. It will prevent BBVA from distorting the marketplace by representing that it charges fewer fees than it actually does.

93.    Plaintiff seeks to enjoin BBVA from misrepresenting and/or omitting material information as to its fee assessment practices in the documents that it makes available to the public.

CLASS ACTION

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT INCLUDING THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(On behalf of the APPSN Class and Multiple Fee Class)**

94.     Plaintiff Hill incorporates the preceding allegations by reference as if fully set forth herein.

95.     Plaintiff Helen Hill and BBVA contracted for checking account and debit card services, as embodied in the Account documents.

96.     BBVA breached the contract when it charged overdraft fees on APPSN transactions and when it assessed multiple NSF Fees on the same item.

97.     Plaintiff and members of the putative Class have performed all of the obligations on them pursuant to the Consumer Account Agreement.

98.     Plaintiff and members of the putative Class have sustained monetary damages as a result of Defendant' breach.

99.     Under the laws of the State of California where BBVA does business, good faith is an element of every contract.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are

mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

100. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

101. BBVA breached the covenant of good faith and fair dealing in its Consumer Account Agreement through its OD and NSF Fee policies and practices as alleged herein. Specifically, BBVA's Consumer Account Agreement misrepresents to accountholders the true nature of BBVA's assessment of its OD and NSF Fees.

102. Plaintiff Hill and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Consumer Account Agreement.

103. Plaintiff Hill and members of the Class have sustained damages as a result of BBVA's breach of the contract and the covenant of good faith and fair dealing.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code § 17200,** *et seq.*

**(On behalf of the APPSN Class, the Multiple Fee Class and Injunctive Relief Class)**

104.   Plaintiff Hill incorporates paragraphs 1-93 as if fully set forth herein.

105.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." BBVA's conduct related to the imposition of overdraft fees violated each of this statute's three prongs.

106.   BBVA committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating the Consumers Legal Remedies Act, as set forth above.

107.   BBVA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by representing that it only authorizes one OD Fee or NSF Fee per item but does otherwise.

108.   BBVA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly misrepresented that it only authorizes one OD Fee or NSF Fee per item but does otherwise.  BBVA's representations are likely to mislead the public with regard to when it imposes overdraft and NSF fees.

109.   As a direct and proximate result of BBVA's unfair and deceptive practices, Plaintiff and Class members suffered and will continue to suffer actual damages.

110.   As a result of its unfair and deceptive conduct, BBVA has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

111.   In addition, BBVA's conduct continues to deceive the general public. BBVA's misrepresentations and omissions in its publicly available account documents and marketing materials are likely to deceive current and prospective accountholders making corresponding public injunctive relief necessary.

112.   Plaintiff also seeks an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendant for themselves and the Class members as follows:

(a)   Declaring BBVA's NSF Fee and OD Fee policies and practices to be wrongful, unfair, and a breach of contract;

(b)   A public injunction that enjoins BBVA from continuing to misrepresent its OD and NSF Fee policies in its publicly available account documents and marketing materials;

CLASS ACTION

(c)    Restitution of all relevant NSF Fees and OD Fees paid to BBVA by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

(d)    Disgorgement of the ill-gotten gains derived by BBVA from its misconduct;

(e)    Actual damages in an amount according to proof;

(f)    Statutory, punitive, and exemplary damages, as permitted by law;

(g)    Pre-judgment interest at the maximum rate permitted by applicable law;

(h)    An order on behalf of the general public enjoining BBVA from continuing to employ unfair methods of competition and commit unfair and deceptive acts and practices alleged in this complaint and any other acts and practices proven at trial;

(i)    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

(j)    Such other relief as this Court deems just and proper.

//

//

//

//

//

//

//

//

CLASS ACTION

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: June 2, 2020                    By:      s/ William Litvak

**DAPEER ROSENBLIT
LITVAK, LLP**
William Litvak
(CA State Bar No.90533)
wlitvak@drllaw.com
11500 W. Olympic Blvd. Suite 550
Los Angeles, California 90064
Telephone: (310) 477-5575

**EDELSBERG LAW, PA**
Scott Edelsberg *
(FL Bar No. 0100537)
scott@edelsberglaw.com
20900 NE 30th Ave #417
Aventura, FL 33180
Telephone: (305) 975-3320

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis*
(FL Bar No. 101754)
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299

*Pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION